# EXHIBIT

# D



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell :* (303) 902-4423

December 5, 2014

**Re: James Steven Sauter and Piper Sauter v. Perfect North Slopes Inc., et al.**

**United States District Court, Southern District of Indiana at New Albany**
**Case No.: 4:12-CV-00027 TWP-WGH**

# EXPERT REPORT

## 1.0 INTRODUCTION

1.1 I have been retained by Markovits, Stock, and Demarco concerning a snow tubing incident at Perfect North Slopes (PNS) on Sunday, January 30, 2011. According to the record 8 year old M███ S███ was injured after her snow tube had stopped. While she was still in her tube and her brother J███ was pulling her both she and her brother T███ were hit by a group of 5 adult tubers who were linked together.

1.2 My CV and list of publications is attached and include herein by reference as **Exhibit 1.**

1.3 My fee schedule is $150 per hour for travel, $250 per hour for all work on this file, and $350 per hour for testimony.

1.4 Attached as **Exhibit 2** and included herein by reference is a list of my testimony for the last 4 years.

## 2.0 BACKGROUND

2.1 My professional experience in winter sports safety issues began in 1967, and I have 47 years of safety training and experiences in the ski and snow sports industry. I have experience in evaluating winter sports sites such as ski areas, terrain parks, tubing and sledding venues, and snowmobiling operations. My safety consultation services include, but are not limited to, incident investigations, collisions, safety policies and procedures within ski resorts, snowmobile tour company operations, tubing and sledding areas, snowmobile and snowcat incidents, terrain parks, ski instruction and supervision issues, and avalanche sites and mitigation. Additionally, I provide liability analysis and litigation support in the areas of guest safety, foreseeable risk, best practices/standards of care, the customs, procedures, and practices related to identifying and providing risk mitigation measures, operational safety analysis of site,

1



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

design, terrain, hazards, and collisions with obstacles, motor vehicles, and man-made objects.

2.2 As a member of the National Ski Patrol (NSP) for 46 years, I am experienced and skilled in responding to incidents and determining the mechanism of injury. I have provided courtroom testimony in Colorado, New York, Connecticut, Vermont, Missouri, North Carolina, Wisconsin, and Florida. I have been qualified as a snow and winter sports safety expert specifically in the categories of ski/snowsports accident investigation, ski safety issues, ski patrolling, terrain park issues, tubing safety issues, ski lift operations/attendant duties, ski collisions, ski accident reconstruction, and causation, and ski instruction. As an expert, I have provided consultation and liability analysis reports on snowsports matters in both state and federal courts in 31 states in the United States as well as in Switzerland, Canada, and Australia.

2.3 I have been a credentialed Emergency Medical Technician (EMT) by the State of Colorado from 1980-2013, and an Outdoor Emergency Care (OEC) provider by the National Ski Patrol. During the course of my career, I have attended National Ski Patrol and ski area safety seminars, educational workshops, case study reviews, and participated in incident scenarios. I have been a ski patrol director, assistant director, ski patrol trainer, and team leader. This work has included taking into account the mechanism of injury, reviewing the evidence, reconstructing the incident, and then, identifying and determining the proximate causation.

2.4 As a veteran snowsports professional I have acquired years of experience in and around tubing facilities beginning with being an on duty ski patroller responsible for responding to tubing incidents. While studying and investigating tubing and sledding venues, both commercial and non commercial, I have tubed, visited and examined approximately 35-50 tubing and sledding locations for the purpose of obtaining specialized knowledge.. As a part of this work I have observed, studied, and analyzed the design of tubing operations with regards to public safety. I have photographed and videoed numerous tubing operations including the design phases and the snowcat construction as well as the grooming maintenance routinely used to control speed. While acquiring my expertise in this area, I have followed and studied evolution of the tubing industry by way of published articles in Ski Area Management magazine, conducted internet research, and studied the National Ski Areas Association Tubing Resource Guide. As a part of my expert work, I have also studied various ski area tubing operations, their operational guides, manuals, policies, and procedures setting forth their practices. As such, I have become a well-informed and knowledgeable expert as to the standard of care in the tubing industry and the customary safety

2



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

practices related to providing ordinary and reasonable safety measures for customers. These safety measures which will be fully described in this report as they relate to the Sauter incident are accepted safety practices in North America. They have evolved over the last 15 years and continue to do so as tubing has gained popularity and become a part of many ski area operations like PNS. As such, I have impartial expert knowledge and experience well exceeding that of the common person helpful and necessary to aid the court's analysis with regards to PNS accountability and ultimately causation in this matter.

2.5 I have observed that snowsports tubing centers over the years, if they stay current and informed, have collectively learned from past mistakes which have resulted in injuries to customers. There has been a focus on safety analysis and injury prevention and an effort to put into place safety measures to prevent unnecessary injury to customers. Both design and operational changes have taken place in order to be proactive with regards to injury prevention.

2.6 <u>Some of these various safety measures, developed over time to mitigate the risks, are well used and accomplished in tubing operations and they relate directly to this matter.</u>

   a.) Taking into account the historical injury records.
   b.) Using the best safety practices in the industry and incorporating the amusement ride concept into customer safety.
   c.) Eliminating risks and dangerous conditions through design or re-design particularly with regards to crossing into another tubing lane or crashing into other tubers after they have come to a stop.
   d.) Attending the regularly sponsored National Ski Areas Association (NSAA) and insurance company sponsored risk analysis, best and current practices, and case study seminars.
   e.) Utilizing the commercial snow tubing lane construction products and devices.
   f.) Putting into practice the best practices and standard of care used in the industry and utilizing these safety measures to provide a reasonably safe tubing experience for customers.
   g.) Utilizing and having onsite a variety of commercial tubing bottoms designed to reduce speed.
   h.) Providing staff employee training and direct supervision consistent with the standard of care for public safety.



*Stanley Gale*
*2205 Douglas Mt. Dr.*
*Golden, Colorado 80403*
*rockymsc@earthlink.net*

Rocky Mountain Ski Consulting

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

i.) Recognizing the effects of over-crowding near the bottom of the hill and establishing safety practices, policies, and procedures to eliminate the risk of tubers hitting other tubers once they have come to a stop.

j.) Establishing standards for linking multiple tubes together sometimes referred to as chaining or rafting, and in some cases curtailing this practice when the tubing chutes become too icy and fast for the outrun or people exiting down below.

k.) Being aware of and monitoring the change in tubing speeds as related to weather, temperature, and nighttime operations and planning appropriately the transition later in the day and employing policies and procedures for reducing the speeds of tubers with regards to safety.

l.) Requiring the customers to review safety videos prior to tubing.

m.) Providing helmets.

n.) Re-grooming the tubing chutes during the day with a snowcat as a safety measure for reducing speed, eliminating collisions at the end of a tubing run, and over shooting the designated outrun.

o.) Having enough well trained employees stationed at the top with radios to space out tubers and to make sure that, once tubers have stopped below, no other tubers are sent down before the prior group has safely exited and is in no danger of being run into. (Sometimes these top stationed employees are referred to as launchers or starters.)

p.) Having enough well trained employees with radios stationed at the bottom and positioned in such a way as to be responsive to where and when  tubers will stop sliding in order to assist the tubers out of their tubes and to provide assistance as needed for customers of all ages to exit the area. (Sometimes these employees are referred to as catchers or brakers.)

q.) Providing radio communications between all of the tubing employee team members, which is particularly necessary with regards to maintaining vigilance for the purpose of monitoring changing tubing chute conditions, speeds, and customers stopping sooner or later than expected.

r.) Constructing and maintaining the dividing snow berms in the tubing chutes for the full length of the tubing trough to prevent lane changes and also sufficiently in the run out area to prevent crossovers.

s.) Designing in and constructing gradual and lengthy upslopes as a part of the run-out area to aid in deceleration.

t.) Designing and constructing a series of speed bumps towards the bottom as an adjunct for speed control.

u.) Making sure that the snow berms between the lanes are sufficiently high, 18 to 24+ inches, and that they run the entire length of the lanes, to prevent a lane change and grooming the sidewalls of the berms relatively smooth.

v.) Constructing the snow berms between the lanes wide, as much as 2-3 ft. across to prevent crossovers and provide a margin of safety.

4



**Stanley Gale**
*2205 Douglas Mt. Dr.*
*Golden, Colorado 80403*
*rockymsc@earthlink.net*

Rocky Mountain Ski Consulting

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

---

w.) Training and having a sufficient number of employees to actively assist all customers, especially children, out of their tubes and safely escort away from the run-out area out of harm's way.

x.) Providing safety measures at the bottom to prevent tubers from crashing into those already down such as dedicated and well marked "walk-a-way" zones out of the flow of tubing traffic.

y.) Having regular safety briefings with other management teams and tubing employees.

z.) Posting safety messages disclosing all collision risks and other potential dangers in places where they will be seen and read.

aa.) Closing the tubing when the conditions are dangerous or too fast for the run-out at the bottom.

bb.) Posting the lane conditions for customers with regards to speed.

cc.) Providing a long enough deceleration and run out zone capable of safely accommodating all speeds and distances the tubers will travel before coasting to a stop.

## 3.0 THE SCOPE OF WORK and THE INVESTIGATION

3.1 The scope of my work was to:
- Review the documents and evidence.
- Conduct an investigation and analysis of the tubing operations at PNS
- Compare the tubing operations at PNS to the standard of care and the customs and practices in the industry
- Conduct research
- Consult
- Prepare an Expert Report

3.2 I conducted an investigation of the tubing facility at PNS on February 1, 2014 accompanied by attorney Louise Roselle from approximately 2:30 p.m. to 7 p.m. I witnessed the temperature transition later in the day accompanied by an increase in tubing speed.

a) As a part of my investigation I made measurements, recorded video, took photographs, measured tubing speeds, and I tubed myself. (I asked for and rented a helmet which was not available at the time of the Sauter incident.)

b) I observed that there were plenty of other children who were unescorted like the Sauter children tubing without helmets, by themselves, and without adult supervision which was an accepted practice permitted by PNS.

5



**Stanley Gale**
*2205 Douglas Mt. Dr.*
*Golden, Colorado 80403*
*rockymsc@earthlink.net*

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

c) I took particular notice of the snow berms separating the tubing chutes. They were not very high (6-12 inches) or well defined. They were considerably smaller in both height and width and less safe than I have seen at other tubing operations. These safety dividers seemed to be well worn and requiring recutting/reshaping and grooming maintenance. They were ineffective from the start of controlling the descent of many tubers. I feared that my own tube might cross over into another lane several times, because my tube rode up onto the snow berm easily. I found this to be a dangerous condition, because lane crossovers were predictable. Indeed, I witnessed this occurring with regularity, especially further down where the tubing lanes become indistinguishable and the dividing berms "peter out."

d) I took my tube up the magic carpet lift with other customers to the top of the hill. I observed first-hand the customary manner at PNS of launching tubers and the way in which it was done. I took notice that the launchers would briefly glance down the tubing chute, often without turning around and typically only with a short peripheral glance downward towards the bottom stopping area before pushing off myself and others. The launchers provided no safety instructions, and they had their hands full marshalling the crowd, moving side to side between their launch lanes, and pulling the tubers forward for launching the queued up tubers. The location seemed to be understaffed. I observed that they pushed off tubers, both singles and groups of tubers rafting together, while other customers who had reached the bottom were still in the chute. Sometimes customers were still sitting or stuck in their tubes and clearly in harm's way.

e) This above described launching procedure seemed not to be a safety concern to the employees and doing so was a standard practice. This course of action was later confirmed by the testimony of Jason Canup the tubing manager since 2005-2006 and the tubing trainer. On page 23 of his deposition he testified that it is the policy at PNS that tubers can be sent down the same tubing lane before someone is actually out the lane and safely out of the way of descending tubers if they are up and moving. He testified on page 22, that with the average crowd he remembers on January 30, 2011, "I would guess she sent them down probably like probably at least 20 to 30 seconds in between," and this could also be between tubers in the same lanes. The tubing attendant, Kelsi Carlson, who launched the Sauter children and the 5 adult snow tubers was a new employee in the 2010-2011 ski season. In her deposition she confirmed the PNS policy that tubers could be sent down the same chute before the bottom of the chute was clear. During her deposition she testified on page 61 she remembered Jason Canup teaching her that you could start someone down the hill before people were

6



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

**Rocky Mountain Ski Consulting**

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

actually out of the lane. This launching procedure was used at PNS in spite of Ms. Carlson's testimony on pages 39, "If it's like little kids, obviously they will need more help, so go up there and try to help them and get them out of the way as fast as you can," when describing her training and the responsibilities for the employees at the bottom.

f) I experienced that it took some time to get out of the tube. Before I had safely exited and was out of the way, other tubers were launched in my tubing chute. They were sliding down towards me which concerned me. As a matter of fact, I needed to hurry and jog quickly away to avoid being hit. I did not expect this, and I found this situation to be a dangerous condition readily accepted at PNS.

g) I observed that tubers were straddling the snowberms between the lanes and also crossing lanes. I was surprised that this condition did not alarm or seem to cause concern amongst the tubing attendants. I found this to be a dangerous condition readily accepted at PNS. The height of the snow berms separating the tubing lanes was uneven, irregular, and inconsistent. The snow berms separating the lanes appeared to be worn or melted down. I estimated that they were no more than 12 inches high, and in some places were less. I witnessed several lane crossings of tubers from lane #7 to lane #8.

h) I measured the speeds of tubers during 3 time periods later in the day. From 5:30 to 5:45 the range of speeds was 18 to 24 mph. From 5:45 to 6:00 the range of speeds increased perceptively and was from 23 to 28 mph. Later on from 6:00 to 6:15 the range of speeds more dramatically increased to a range of 27 to 34 mph. It was predictable and easy to understand and observe that the speeds were increasing rapidly over time as the sun set and icy conditions developed. There were many children tubing by themselves without adults during my time at PNS. Some customers were tubing alone and others were linking up forming multiple person tubing rafts regardless of speed and the increasingly icing conditions.

3.3 I have reviewed and relied upon the documents attached as **Exhibit 3** and included herein by reference.

## 4.0 THE FACTS AND CIRCUMSTANCES

4.1 On Sunday, January 30, 2011 M▮▮▮ S▮▮▮, age 8 went tubing with her brothers J▮▮▮ and T▮▮▮ and other families as a part of a Cub Scout children's activity at PNS. She arrived with her mother, father, and brothers later in the afternoon. As was the widespread and permitted practice at PNS, the parents remained on the premises while the children went tubing. There were no helmets at the tubing facility for rent.

7



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

The children went up the magic carpet conveyor lift to the top unload station and walked left to the tubing lanes. On their first run down they held onto each other's snow tubes provided by PNS. They were customarily launched as a group and down the tubing lane chute (the Chute) by employee Kelsi Carlson. The children tubed and slid down the tubing chute and coasted to a stop on the flats and within sight of employee Sean Stott who was stationed 50 to 60 yards away.

4.2  According to the testimony of brother J████ S████, when they completed their tubing run M████ was stuck in her tube and couldn't get out. J████ and his brother T████ were able to get out of their tubes. J████ pulled sister M████ still in her tube, towards the exit area. Brother T████ walked right beside him. The 3 children started walking while still in their own lane. They intended to walk through the gravel and then to exit the tubing area. As they were in the process of exiting and in full compliance with the policies and procedures set forth by PNS, J████ testified on pages 14-18 that *by chance* he "saw them coming." "I jumped out of the way, T████ kind of, tried to jump over them and then M████ couldn't get out of her tube so she got hit." "I jumped out of the way and then T████, kind of, got hit, M████ got directly hit." He did not hear anyone yelling at them to get out of the way.

4.3  The first person on the scene was Sean Stott who was the closest tubing attendant. He yelled and ran towards the children. He recognized that they were going to be hit by the group of 5 linked adult tubers who were uphill and heading down and on a collision course. He radioed for help and other employees including the ski patrol arrived. M████ was unconscious when he got to her, and she was attended to by the ski patrol. The Dearborn County ambulance crew arrived and she was transported to a helicopter landing zone and airlifted to Cincinnati Children's Medical Center. As a result of being hit M████ S████ sustained a traumatic brain injury, fractured skull, fractured eye orbit, abrasions, and contusions.

4.4  The children were hit by the five adults whose tubes were linked and had come to PNS for a birthday party. The adults were Andrew Broaddus, Stephany Daniel, Christopher Daniel, Anthony Warr, and Jenny Warr.

a.) Anthony Warr, an eyewitness, testified on pages 31 to 32 that after he was already in motion tubing down he saw the children at the bottom of his tubing lane. He testified on page 31 that he did not see the children cross over into his tubing lane and that he actually saw another customer tubing in lane 7 while his group was descending in the adjacent lane. He recalls seeing two children standing up and M████ being pulled in her tube. There was nothing their group could do to avoid the collision. Their tubes kept going, and Stephany got hurt. He ran back to the children, and M████ was unconscious.

8



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

b.) Jenny Warr described the lanes in her testimony as icy. She uses the words ice or icy 7 times in her deposition testimony. She testified on page 33 that she did not know if the children were in the same lane as the adults. She testified on page 61 that she had no basis for saying that the children should have been accompanied by a parent.

c.) Andrew Broaddus recalls that he briefly saw the children in lane #8 just before the collision. He saw the bottom of a tube cross over the top of him and come in contact with his head, and his head hurt afterwards.

d.) Stephany Daniel remembers that the lane was fast, slippery, and she testified on page 40, "It's ice." In describing the tubing chute conditions she uses the words ice or icy 15 times. She didn't see anything, and this was their second time down the hill. Her brother Christopher screamed, and then there was the collision. She testified on pages 48-49, "I got hit on the back of the head and I was a little dazed, so when I got up everybody was already out of their tubes, and then we were told to get off the ice by the person at the bottom of the hill." The people at PNS in the hut gave her Advil for her headache. There is no record of her completing an incident report for her injury. Her dad drove both her and her brother who got hit in the face to the hospital. She had both an x ray and an MRI.

e.) Christopher Daniel on pages 29-30 recalls that he was hit in the face by a child and he remembers spitting out blood. On pages 39-40 he testified that his teeth got knocked loose, his joints were hurting, the whole left side of his face was hurting, the bottom of his lip was cut. He had a headache afterwards like his sister. Although her headaches continued for some time, his did not after receiving medication. Neither he nor his sister gave any statements to PNS or was an incident report prepared by PNS. Although he did see the children "in our lane," he testified on page 28 that he did not see them cross over into the adults' lane.

4.5 The tubing launcher up at the top, Kelsi Carlson, had just begun her shift. She had been working for only about 15-20 minutes when the collision occurred. She testified that she remembers pushing the children down but not very much else. She doesn't remember watching them go down or remember pushing the 5 adult tubers down the chute. She testified on pages 26-27 that she received no instruction to watch tubers going down the tubing hill. She did not see the children's 3 linked tubes change lanes, and she has no recollection of seeing the Sauter children at the bottom. She was trained that little kids will need more help getting out of the way at the bottom and that the tubing employees at the bottom will help them. She knows that tubes can



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

merge into other lanes at the bottom. She has seen children get stuck in the tubes. She testified on page 57, "But you do have those cases where, for some reason, people don't have their parents with them. And so we go over and help them get out of the tube and get them the strap and hand it to them and tell them to get out of the way." She did not see the five adults linked tubes cross lanes. She doesn't remember if she saw the collision although in her written statement she writes that she did see the collision.

4.6 The tubing attendants at the bottom were Katherine Hester and Sean Stott, who had recently arrived for their shifts. Katherine Hester, a 5 year PNS employee who had only been working that day for about 10 minutes, recalls seeing Sean Stott running over towards the children. She testified on page 14, "If you have adults going down, you're going to have more weight. If you have children going down they weigh less so they're not going to go as fast." She also recognizes and understands that as the sun goes down the lanes will speed up. She doesn't know how the incident happened. It "happened so fast." On page 42 she testified, "What you would do is you wait for them—for kids who don't stop in the gravel *(located past the snow run out area)*, like these kids did not, you wait for them to get to their feet and make sure they're at least half way through the gravel before you send somebody down after them. Give them plenty of time, it doesn't matter the age, weight, or anything, wait for those people to get off their feet. Once they start walking and they're out of the way, go ahead and send down your people." Ms. Hester testified on page 48 that there was never a discussion that icy conditions could make tubing dangerous. She also did not see the Sauter children or the 5 adult tubers cross over lanes from her vantage point closer to the conveyor lift. She did not know what lane the adults came down in [36]; did not know if the collision occurred in the same lane the children came down in [32]; does not know if the children and the adults were in the same or a different lane [42]; and did not see what M███ was doing or what lane she was in right before she was hit [33].

4.7 Sean Stott was a new employee in the 2010-2011 ski season.  He had just arrived for his shift at PNS when this collision occurred. He testified that while watching the tubing lane traffic, he knew the Sauter children were going to get hit. They had come to a stop in their lane and they had not crossed over to any other lane. He testified on pages 15-16, "The lane they came down was a different lane from the adult tubers. They had—at the end of the hill, and I don't want to say that they walked in to their lane, because they didn't. They had just spread out enough to get clipped by that group." On page 16 he testified, "They were walking away from where they had stopped toward the stopping area, and they were doing what they were supposed to be doing."  They stopped before the gravel deceleration area, because they were "three light children." As he was watching he testified on page 17 that he  knew that the

10



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

group coming down the lane was going to collide with the group of children. He had seen other collisions. He testified on page 19 that the children were exiting "as correct as they could have." The adults had enough speed to continue a quarter to half way through the gravel. When he first saw the Sauter children they were 50 to 60 yards away, and when they collided, he was 10 to 15 yards from them. He testified that he believed that children came down lane #7. He told people that, when the collision occurred, the children were in the same lane that they had come down in (lane #7), which is consistent with J███ S███'s testimony. Stott said he noticed the larger group coming down the same lane and so he started yelling to the Sauter children. *(The incident diagram locates the point of rest/impact near the bottom of lane #8., however, there is no evidence that the investigators confirmed this with Sean Stott. They did not witness the collision.)* He saw other tubing collisions both before and after January 30, 2011 when people were exiting.

4.8  The PNS Tubing Manager Jason Canup did not walk up or down lane #7 after the incident. He closed lanes 7, 8, & 9 after the collision. He testified that there is nothing in the tubing training manual about children tubing alone or linking their tubes together. He doesn't train the attendants that a crossover can happen. He had never read the NSAA Tubing Operations Resource Guide until the night before his deposition. He has never measured the height of the snow berms between the tubing lanes but estimates them to be roughly a foot high. With regards to changing or straddling the berms between the lanes, he testified on page 85, "I doubt much of it was brought up…." He testified on page 95 that if the children's parent, Mr. Sauter, was standing at the bottom, "I don't believe—If the employee was unable to get there, I don't believe he would have been able to get there if he were standing at the bottom." One of the bullet points for the clearing attendant is, "Stand on the ridge, be aware of oncoming tubers, and don't get hit." On page 119 Mr. Canup testified that if the berms are not high enough there can be crossovers. While he was in the break room, he heard Sean's radio call "like he was running," to the children. He ran out, and could see that the 5 tubers went all the way to the gravel and past the children. He testified on page 153 that there were no tubing helmets for rent at that time. They were only available in the ski lodge a considerable distance away from the tubing center.

4.9  Mike Mettler, the PNS Director of Snowsports Operations, testified that snow tubing at PNS has been going on since 2002. Chuck Heist was the tubing hill manager when the incident occurred. The construction involved Mettler, Chuck Heist, Chip Perfect, the general manager, and David Guzman. Previously the area was a pasture, and no engineers were consulted. He has attended NSAA sponsored regional meetings that

11



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
*rockymsc@earthlink.net*

Rocky Mountain Ski Consulting

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

discussed how to build a tubing hill. At the national meetings there were individual meetings where the agenda had to do with the development of snow tubing. Mr. Mettler did not attend those. The tubing hill was groomed by Keith Hartman in the morning between 5 a.m. and 6 a.m. Mr. Mettler and Tom Price, the ski school director, walked part of the tubing area, and they looked for marks on the snow, because they assumed the children had crossed over lanes farther uphill from the collision location, although there were no witnesses, including all parties directly involved, who reported a lane cross over. He testified on page 106, taking into account all of the interviews he has done and the people that he has talked to, that the Sauter children did nothing to cause themselves harm. The tubing hill was closed later that night and again 2 days later due to freezing rain. After the collision and later that night after 8 p.m., PNS reduced the number of tubes that could be linked together.

4.10    Keith Hartman who builds the tubing lanes and grooms them has not had any classes, training, or reviewed any tubing manuals. He has never visited another tubing center, and he is not aware of how other areas make their lanes. The construction is "all done by sight and testing." As to how high to build the snow berm walls, he testified on page 16 that Chuck Heist did not tell him how high they needed to be, "I think it was something we came up with by what the machine allowed." He doesn't make any measurements or take them. He testified regarding the slope angle on page 32 that his understanding is that the pitch really doesn't matter.

4.11    To construct and shape the tubing lanes Mr. Hartman made an attachment in 2005 to bolt onto the front of the snowcat. He doesn't keep any records of the grooming or the maintenance of the tubing hill. Neither Jason Canup nor Chuck Heist had ever talked with him about the proper height of the snowberms between the lanes. He knows that the berm height can be affected by weather conditions such as warm rain and melting. After the incident he walked down the lane when 7, 8, and 9 were closed. He testified on page 58, "I didn't see anything out of the unusual [sic]." He did not see a spot where any tube allegedly crossed over, and he told that to Chuck Heist.

4.12    Chuck Heist testified on page 15, "No one in the tower is actually watching" the tubing hill. It's not an assigned position. He arrived on scene with the patrol pack. He has visited 20 tubing locations. The "clearing attendants" should be stationed within 30 ft. in front of or behind where the customers will stop. After this incident they added rental helmets. The tubes come from Tube Pro, and they chose the smoother, faster bottoms, "to bring customers further down the hill so we get more customers to

12



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

**Rocky Mountain Ski Consulting**

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

flow through tubing park." He describes PNS as one of the largest tubing parks in the U.S. There was another serious incident at the tubing hill later in the evening after M█████ was injured after he had gone home. A woman had continued through and past the gravel section and hit the Willy Bags at the far end, because the hill was icy and frozen. She was transported to the hospital by the Dearborn County Ambulance Service. Additionally, while M████ S████ lay unconscious on the ground, Mr. Heist testified on page 22 that he observed a linked group cross over from lane 7 to lane 8. "I don't know how they did that." "I'm sure that's what I saw." Both tubing lanes 7 and 8 were subsequently shut down.

4.13    Chip Perfect, the general manager for PNS, has taken seminars and conferences related to snow tubing. PNS is one of the largest tubing operations in the U.S., and has 90,000 to 96,000 customers annually. There is nothing in exhibit 58, Scout Day at Perfect North that recommends parents accompany their children snow tubing. Neither exhibit 60 describing the outing nor exhibit 62 the snow tubing reservation #5508003000 say anything about having parents accompany their children snow tubing or recommend this. These 3 exhibits appear to originate with PNS. Mr. Perfect has never read the National Ski Areas Association Tubing Resource Guide. He doesn't think it's important to have a copy at PNS. He testified that many of the tubing injuries occur in the run out area *(where M████ was hit)*, and that customers may reach speeds of 50 miles per hour.

4.14    Mike Mettler and Tom Price prepared an Incident Diagram Bates #00128 which is attached as **Exhibit 4** and included herein by reference. In this diagram it is written, "From all witness statements are *(our)* belief is that the tubers from lane 7 *(the Sauter children)* crossed over to lane 8. This crossing slowed them to a stop before reaching the Run out Distance that the other tubers were achieving during that time period." They measured the width of the lanes to be 13 ft. 6 in. wide, and the diagram depicts the Point of Rest to be 25 ft. from the run out area.

## 5.0 OPINIONS

There are multiple possible explanations as to how this incident happened, some of which are supported by evidence while others are simply hypotheses. One explanation is that the Sauter children and the adults collided in the run out area, because the berms are virtually nonexistent there and thus the lanes are indistinct. This explanation is consistent with the testimony of Stott and J████ S████. This explanation is not at odds with the testimony of the adult tubers who observed the children before the collision (Anthony Warr, Broadus, and Christopher Daniel). It

13



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

explains why the two groups collided without positing a cross-over on the hill above (which no witness saw). Another explanation is that the Sauter children crossed over from lane #7 into lane #8 somewhere up the hill, but again there is no witness who saw this. This was nevertheless the "belief" of the PNS investigators Mike Mettler and Thomas Price. This belief is not supported by the evidence or the testimony. Taking into account the light weight of the three children, it is unlikely that this took place. Yet another potential explanation is that the 5 heavier adult tubers crossed over from their lane #8 into the Sauter's lane #7 higher up on the slope. None of the adults testified that this occurred.

And finally, given the testimony of Stott, Anthony Warr, Broadus, and Christopher Daniel placing the children in their same lane as the adults when the collision occurred, it is conceivable that the children actually were sent down first in lane #8, and that the 5 adults were sent down the same tubing lane #8 after the children.

5.1 Regardless of which scenario a jury might believe, it is clear is that the Sauter children were sent down a tubing lane, that they stopped short of the gravel due to their light weight and that the 5 adult tubers were sent down a tubing lane before or after the children had stopped. The Sauters were not given enough time or assistance by Sean Stott to proceed the rest of the way down the tubing lane sufficiently out of harm's way. This explanation for the incident is supported by the evidence, the testimony of the parties who were tubing, and particularly so by the eyewitness testimony of Sean Stott who was the attendant closest to the collision and who testified that both groups of tubers were in the same lane prior to the collision where the lanes are indistinct.

**6.0  CONCLUSIONS**

6.1 The tubing lanes were improperly constructed without any design incorporating or taking into account all of the customary practices and standards of care related safety. The design process failed to incorporate important safety practices set forth in the NSAA Tubing Resource Guide[1], particularly those addressing the run out distance and the height of the snow berm dividers between the tubing lanes. PNS breached the duty of care in these areas of public safety.

6.2 The snow berm dividers separating the tubing lanes were too low, and they did not prevent crossovers. They were half as much as recommended by the NSAA Tubing Resource Guide which was 18 to 24 inches. They were not vertical enough to prevent

---

[1] NSAA claims that this Tubing Resource Guide is no longer in use.

14



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

**Rocky Mountain Ski Consulting**

the tubers from riding up, onto, and over the snow berms. These dividers did not extend into the run out zone so there was no way they could substantially and effectively prevent crossovers and collisions in the area where the children were hit. They were not well defined top to bottom. Attached as **Exhibit 5** and included herein by reference are 18 photographs depicting the standard of care with regards to snow berms constructed and maintained   reasonable and sufficient height between tubing lanes. PNS made the conscious decision to have lower than industry snow berm lane dividers.

6.3 The snow berm dividers were too narrow across. They should and could have been wider. Because they were narrowly constructed, there was no reasonable margin of safety to prevent tubers from crossing into adjacent lanes. The tubing lanes were crowded together. Attached as **Exhibit 6** and included herein by reference are 3 photographs of tubing lanes utilizing this reasonable safety method to mitigate the risk of a lane cross over.

6.4 The attendants were not properly trained to recognize and be watchful for the increasing speeds as the lanes got icier, particularly those customers who were permitted to be linked together in multiple tube rafts. They did not recognize the dangerous condition developing. This was or should have been obvious to Jason Canup and other tubing center employees. Allowing 5 adults to form a large and heavier tubing raft in either the same lane or a lane adjacent to the 3 lighter children unnecessarily exposed the children to the risk of being hit. Considering the many tubing lanes at PNS, it was feasible to reserve certain lanes for heavier linked tubers in order to provide more of a margin of safety.

6.5 The attendants were not properly educated and trained to fully recognize and appreciate the likelihood and objective danger of linked tubes overtaking slower moving and lighter tubers. It was feasible and reasonable to incorporate this into both training and the operational safety practices at PNS.

6.6 The management team failed to recognize the substantial and unnecessary danger it was exposing M███ S███ to by permitting the top attendants to send down the group of 5 adults before the children were out of the way and had safely exited the area. Moreover, the attendants were not trained to wait until the lane in use was totally clear of customers and they were out of harm's way before sending tubers down the same lane. PNS breached this fundamental and basic standard of care and unnecessarily exposed the children to the foreseeable risk of being hit.

6.7 The tubing manager Jason Canup failed to actively supervise the tubing operation at the time the children were hit. Had he been ordinarily vigilant and outside on the hill



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

as the tubing speeds were increasing towards the evening hours, he would and should have recognized a developing situation which was compromising public safety. He could easily have provided instructions to the tubing employees and made some adjustments with regards to linking tubes earlier in the day rather than later on at 8:00 p.m. after another injury related to speed occurred requiring an ambulance.

6.8 Jason Canup failed to recognize the increase in tubing speeds as a potentially dangerous condition developing in spite of his years of experience at PNS. He made no attempt to take sensible actions before the Sauter collision to prudently and reasonably mitigate the dangerous conditions.

6.9 The PNS ownership and management teams, considering their years of combined experience, failed to identify and understand the risks they were exposing their customers to. They failed to take reasonable and ordinary steps to mitigate risks that caused this avoidable incident. They failed to take into account the preceding 5 years of injury records. (Exhibit 7) My review of these records beginning with 2005-2006 when there were 3 injures up to the preceding year of M████'s collision, 2009-2010 when there were 16 injuries, reflects a trending upwards and dangerous safety issue and an increase of 533%.  Nevertheless, PNS failed to make simple no cost and feasible changes in both training and operations to address this significant safety issue. Moreover, the management team failed to use the customary industry safety practices available with regards to controlling speed. Even though they understood and knew that speed and distance will increase and decrease according to weight and temperature conditions, they took inadequate steps prior to the collision to address the situation. PNS breached their reasonable and ordinary duty of care to address just this sort of incident from reoccurring when it was inevitable that a do nothing approach was a recipe for tragedy.

6.10    There were no contributory behaviors by the children which created or enhanced the risk of a collision once they were stopped.

6.11    Taking into account the testimony of Sean Stott, I agree that had a parent been at the bottom in the same position as Stott, the bottom attendant, the parent could have done nothing to prevent the collision.

16

**Stanley Gale**
*2205 Douglas Mt. Dr.*
*Golden, Colorado 80403*
*rockymsc@earthlink.net*

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*



Rocky Mountain Ski Consulting

6.12    There was nothing in writing or posted on the premises proximate to the tubing hill requiring parents to be linked to their children's tubes[2]. Rather, it was the practice at PNS and other tubing centers to permit children to tube without a parent. Indeed, PNS invites school and other groups without parents and direct supervision to tube.

6.13    The attendant Sean Stott was stationed too far away to be of help to avert the collision. According to the record he performed his duties such as he was trained to do. The training, supervision, and safety standards at PNS were deficient and fell below the ordinary and reasonable standards of care in the industry.

## 7.0 SUMMARY

7.1 A confidential analysis and report which I have reviewed in this matter by the insurer has identified and established the potential for risk of an incident such as what happened at PNS. Reasonable safety measures and proper staff training could have eliminated the risk and prevented the incident. PNS failed to identify the risk and to put into practice reasonable injury prevention measures. Had it done so, there would have been no incident.

7.2 There is an established safety hierarchy with regards to risk prevention. The first and most effective action is to remove the risk. This could have been achieved by a combination hill design, staff training, and operational procedures. The second, but not as effective action would have been to use the existing products or devices to reduce the speeds of the 5 adult tubers. Having them link up with a tubing bottom designed to reduce speed or to put down rubberized mats for speed control are widely used in the industry. Along these lines, helmets could have been available. PNS failed to use these safety measures to mitigate the potential for collisions involving children.

7.3 There was a recorded history of injuries at PNS where speed, distance, and collisions were factors. What is unknown is how many collisions or injuries there were which went unreported or undocumented. My analysis of the PNS Tubing Incident Reports for incidents in the tubing area for the preceding 5 years 2005-2010 when Jason Canup began his employment as the tubing manager is attached as **Exhibit 7** and included herein by reference.
- In 2005-2006 there were 3 incidents.
- In 2006-2007 there were 8 incidents representing a 266% increase over the previous season.

---

[2] There was a small sign on a glass door in the room where the groups meet that the Sauters did not see. There was also a small sign on the window where tickets are purchased, but the Sauters would not have gone to that window because they were not the group leaders.



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

- In 2007-2008 there were 14 incidents representing a 175% increase over the previous season.
- In 2008-2009 there were 12 incidents.
- In 2009-2010 there were 16 incidents representing a 133% increase over the previous season.

There was a significant and dangerous trending of serious incidents requiring an ambulance. The total for the 5 years preceding was 55 reported incidents. The overall increase in incidents was 533%. As such a serious injury involving speed, distance, and a collision was 5 times more likely to occur during the season that M███ was injured than it was 5 years earlier. This trend was or should have been known to the PNS management team. According to the record, PNS took no steps and there was a do nothing approach to addressing the injury trend. PNS breached the customary safety practices in the snow sports injury to address injury patterns by analysis, operational changes, and remediation when it was feasible, practical, and necessary to do so. They neglected to address the safety issues which caused M███'s injuries. Attached as **Exhibit 8** and included herein by reference are 2 letters from customers who were injured and a parent of a child injured.

7.4  Taken in totality;
- the overall conduct of PNS as reflected in the record,
- the numerous breaches of industry safety practices,
- the multiple breaches of standard of care in the tubing center,
- the disregard for tubing injury trends at PNS,
- the intentional disregard and indifference for public safety,

It is my opinion to a reasonable degree of professional certainty that PNS was irresponsible and reckless from a snow sports safety standpoint. It was not rational to carelessly expose M███ S███ and her brothers to the risk of a serious injury resulting from being hit after she had completed her tubing run.

7.5  There were multiple ways in which PNS continued to conduct its tubing operations without taking responsibility or making an effort to prevent or mitigate the risk of a serious injury for at least 5 years. This substantial neglect and disregard for customer safety coupled with the multiple breaches of the customary standards of care and the widely accepted industry safety practices were the primary factors contributing to the incident. The state of affairs present when the Sauter children were tubing was a recipe for disaster. PNS is solely responsible.

18



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

I reserve the right to supplement or amend this report if I am provided additional evidence to review or conduct a second investigation at PNS.

Respectfully submitted,

Stanley Gale



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

# Exhibit 1

# Curriculum Vitae

## Stanley Gale

### Forty- Seven Year Ski  and Snowsports Safety History

My professional experience in winter sports safety issues began in 1967, and I have 47 years of safety training and experiences in the ski and snow sports industry. I have experience in evaluating winter sports sites such as ski areas, terrain parks, tubing and sledding venues, and snowmobiling operations. My safety consultation services include, but are not limited to, incident investigations, collisions, safety policies and procedures within ski resorts, snowmobile tour company operations, tubing and sledding areas, snowmobile and snowcat incidents, terrain parks, ski instruction and supervision issues, and avalanche sites and mitigation. Additionally, I provide liability analysis and litigation support in the areas of guest safety, foreseeable risk,  best practices/standards of care, the customs, procedures, and practices related to identifying and providing risk mitigation measures, operational safety analysis of site, design, terrain, hazards, and collisions with obstacles, motor vehicles, and man-made objects.

I have taught skiing, and I have ski patrolled for nearly 40 years.  Over the course of my career, I have skied and inspected thousands of ski trails in approximately 275 ski areas as well as tubing and sledding venues and terrain parks. Attendant to my duties as a ski patroller I have worked with and assisted terrain park attendants and lift attendants with their duties. I have operated both surface lifts and chairlifts, and I have spent thousands of hours assisting lift operators. As a longtime member of the National Ski Patrol (NSP), I am experienced and skilled in responding to collisions and determining the mechanism of injury. As a credentialed ski instructor with the Professional Ski Instructors of America (PSIA), and having taken numerous PSIA classes on-snow, I am educated and knowledgeable in movement analysis and the safety issues regarding guest safety and teaching students. I have provided courtroom testimony in Colorado, New York, Connecticut, Vermont, Missouri, North Carolina, Wisconsin, and Florida. I have been qualified as an expert specifically in the categories of ski/snowsports accident investigation, ski safety issues, ski patrolling, terrain park issues, tubing safety issues, ski lift operations/attendant duties, ski collisions, ski accident reconstruction, and causation, and ski instruction. As an expert, I have provided consultation and liability analysis reports on ski safety and other snowsports matters in both state and federal courts in 31 states in the United States as well as in Switzerland, Canada, and Australia.

1



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

**Off : (303) 279-0454**
**Fax : (303) 279-0453**
**Cell: (303) 902-4423**

As a veteran snowsports professional I have acquired training and experience in ski mountain geography, topography, and their relationship to ski and snow safety issues. I am experienced and skilled in ski and snowsports terrain analysis, the design of winter sports facilities, and the ways which these factors relate to skiing patterns, avalanches, collisions, snowmobiling, tubing, terrain parks, sledding, and other areas of public safety. I have operated snowmobiles since 1970 on trail, off trail, and on ski slopes.

I have been a credentialed Emergency Medical Technician (EMT) by the State of Colorado from 1980-2013, and an Outdoor Emergency Care (OEC) provider by the National Ski Patrol. During the course of my career, I have attended National Ski Patrol sponsored educational workshops, case study reviews, and scenarios. I have been a ski patrol director, assistant director, and ski patrol trainer, and team leader. As a part of my duties, I have taught and instructed the "rules of the road" Your Responsibility Code to the public and other ski professionals. During the course of 47 years of experience in skier safety, and as a part of my daily duties, I have logged thousands of hours of experience observing skiers on the slopes, enforcing and implementing Your Responsibility Code, identifying reckless and out of control skiers, and assessing skiing movements and tactics. I have been the first ski patroller on scene caring for the injured, responding to incidents, and investigated incidents on various types of ski trails including open alpine bowls, slow zones, and at or near merging trails.

My skier safety experiences and duties have also included opening and closing ski trails including terrain parks, reporting, investigating, and reconstructing ski and snowsports incidents. I have attended numerous continuing education seminars, classes, and meetings where case studies, analysis of ski/snowsport incidents, and guest safety have been reviewed with ski area management, medical personnel, other ski patrollers and ski instructors. This work has included taking into account the mechanism of injury, reviewing the evidence, reconstructing the incident, and then, identifying and determining the proximate causation.

## Partial Resume

2014- Colorado Snowmobile Association- Safety Director

2006- Present  National Ski Patrol- Alumni Status.

1967-2005     National Ski Patrol: active ski training and patrolling.

2005-2006     Vail Resorts, Keystone Resort. Ski instructor.

**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net


Rocky Mountain Ski Consulting

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

2005            Loveland Basin Ski Area. Ski instructor.

2004            Loveland Basin Ski Area.  Member of professional ski patrol team for early season race training for World Cup and Olympic Ski Racers.

2004            Colorado Ski Guides in partnership with Utah Ski Guides: owner/operator.

2004-2008      National Ski Patrol Avalanche Instructor

1990-2003      Snowcat Assisted Wilderness Skiing and Snowboarding Tours- Part time and volunteer guide: Terrain analysis, avalanche safety, snowcat safety, guest safety:
- 2005- San Juan Snowcat, Colorado. Assessment of a proposed terrain expansion.
- 2003-Jones Pass, Mt. Fun Snowcat, Colorado. Organized medical support team and participated with fellow patrollers and head guides in avalanche mitigation and terrain analysis for 2003 Jones Pass Extreme Ski and Snowboard Competition.
- 1991- Chicago Ridge Snowcat Tours, Colorado.
- 1990- Steamboat Powder Cats, Colorado.

2000-2005      Loveland Basin Ski Area, Colorado. Part time professional ski patroller, providing mountain education and on snow tours per request of patrol director, snowmobile duties, helping to train new patrollers, avalanche control, team member of Level II Avalanche Course Instructors, team member of  avalanche mitigation and explosives crew.

1984-2002      Copper Mountain Ski Area, Colorado. Ski patroller- volunteer/professional:
- Ski patrol team leader- continued training and supervision of a team of new and experience ski patrollers.
- Member of Slope Watch Safety Patrol (ski patrol division)- educating skiers and snowboarders on safe skiing practices including enforcement of the Skier Responsibility Code as well as identifying, educating, and slowing down fast/ reckless skiers.
- Ski patrol race crew responsibilities including course set up and spectator safety.
- Team member of a group of high alpine senior patrollers stationed at the top of Copper Bowl and Tucker Mountain.

1974-1984      Arapahoe Basin Ski Area, Colorado. Ski patrol, patrol training instructor, assistant ski patrol director, mountain sweep leader, National Ski Patrol Mountaineering Instructor, volunteer.

3



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

1972-1974    Hidden Valley Ski Area, Rocky Mt. National Park, Colorado. Ski patrol, volunteer.

1970-Present   Snowmobile operations.

1970-1971    Song Mt., Tully, New York.  Part time ski instructor as needed.

1970-1971    Song Mt., Tully, New York.  Professional full time ski patrol director.

1968-1971    Greek Peak Ski Area, Cortland, New York.  Ski patrol, senior (advanced) Status, volunteer.

1967-1968    State University of New York College at Cortland: Intercollegiate ski team.

## Awards
2004    Bergen Valley Intermediate School, Teacher of the Year

2000    Centennial Canoe Outfitters, Head River Guide Award

1999    Copper Mountain Glacier Award, Fifteen Year Service Award

## Certifications and Advanced Training
2008    Colorado Snowmobile Safety Certification.

2006    Forensic Investigator Technician, National Association of Safety Professionals.

2005    Professional Ski Instructors of America- Certified Level I.

2005    National Ski Patrol (NSP), Avalanche Instructor Certification.

2005    National Ski Patrol System Instructor Development Certificate of Achievement.

1987    Basic Trauma and Life Support.

1980- 2013   Colorado Emergency Medical Technician Level B (EMT-B).

4



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

| | |
|---|---|
| 1977 | National Ski Patrol Level II Advanced Avalanche Training, emphasis on snow pack analysis, route selection, terrain analysis, and avalanche search and rescue leadership skills. |
| 1974-Present | Outdoor Emergency Care Technician Certification, National Ski Patrol System. |
| 1974 | National Ski Patrol Level II Advanced Mountaineering Training, search and rescue, route selection, mountain leadership skills, terrain analysis, and mountain overnight bivouac and survival skills. |
| 1974 | National Ski Patrol Level I Avalanche Training, safe mountain travel, avalanche recognition and dangers, group decision making. |
| 1969 | National Ski Patrol Level I Mountaineering Training, safe mountain travel, mountaineering skills, and orienteering, equipment considerations. |
| 1967 | National Ski Patrol training and first aid certificate. |

## Conferences and Clinics

| | |
|---|---|
| 2014 | Colorado Snow and Avalanche Workshop- Breckenridge, Colorado |
| 2014 | International Snowmobile Congress, Keystone, Colorado |
| 2013 | American Society for Testing and Materials (ASTM) Winter Meeting: F27 Committee- Snow Skiing- Salt Lake City, Utah. |
| 2013 | Professional Ski Instructors of America- Fall Workshop, Winter Park, Colorado |
| 2011 | American Association for Testing and Materials (ASTM) Summer Meeting: F27 Committee- Snow Skiing- Burlington, Vermont. |
| 2011 | 19th International Congress on Ski Trauma and Skiing Safety, International Society for Skiing Safety, Keystone, Colorado. Topics included mountain resort Safety, quality management systems, ski and snowboard injury epidemiology and methods, ski racing injuries and barrier protection, terrain park design and injuries, ski boot-binding equipment systems and related devices, wrist protection, helmets, orthopedic issues in winter sports, and other topics. |
| 2010 | American Society for Testing and Materials (ASTM) Winter Meeting: F27 Committee- Snow Skiing- Denver, Colorado. |



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

| | |
|---|---|
| 2010 | Professional Ski Instructors of America- All Mountain Performance Skiing, Winter Park Resort, Colorado. |
| 2009 | Patroller Education Conference (PEC)- National Ski Patrol, Snowbird, Utah. |
| 2008 | Professional Ski Instructors of America- All Mountain Performance Skiing, Aspen Snowmass, Colorado. |
| 2005 | International Annual Conference. Recreation and Adventure, Program Law and Liability- Denver, Colorado. |
| 2005-2012 | Loveland Basin Ski Area, Keystone Ski Resort (Vail Resorts), Aspen/Snowmass, Winter Park, Colorado: Professional ski instructor (PSIA) clinics- instructor training associated responsibilities and duties, skier safety issues, terrain choice decisions, movement analysis, etc. |
| 1968-2014 | Yearly National Ski Patrol medical refresher clinics and ski area on the hill refreshers classes and clinics- participant and instructor. |

## Professional Affiliations

Co-founder of the California Ski and Snowboard Safety Organization, past board member
National Ski Patrol, Rocky Mountain Division
International des Patrouilles de ski (International Ski Patrol)
International Society for Skiing Safety
American Snowsports Education Association
Professional Ski Instructors of America
American Association of Avalanche Professionals/dba, American Avalanche Association
International Skiing History Association
Colorado Snowmobile Association
Colorado Mountain Club
American Society for Testing and Materials (ASTM)-F27 Snow Skiing Committees: F 27.10
Binding Test Procedures, F 27.30 Skis and Boots, F27.50 Shop Procedures (Retail and Rental), F 27.85 Snowboarding, Terrain Park Standards Research and New Products (Terrain Parks), Snowboarding
Back Country Snowsports Alliance
National Education Association
Colorado Education Association

6



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net



*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

## Publications

Instructor to Instructor Magazine
The Journal of the Rocky Mountain Professional Ski and Snowboard Instructor, Fall 2006:
Authored: Ski Safety and the Savvy Instructor.

## Education

1968           University of Heidelberg, Germany. Psychology and German studies, one semester.

1970 BA       State University of New York, College at Cortland.  Major: psychology, minor: German.

1974 MA       University of Northern Colorado, Teacher of the Visually Impaired, grades K-12. Certification in orientation and mobility Travel Skills for the visually impaired.


Post Graduate Studies:
          University of Northern Colorado
          Colorado School of Mines
          Colorado Mountain College

## Public School Teaching

1974-2004     Pre-school to grade 12 visually impaired and multi-impaired; elementary, all subjects, grades 1-4, team leader, supervising teacher, mentor teacher.

1996-97       International teacher exchange - New South Wales, Australia, visually impaired, itinerant resource teacher/consultant.

1985-86       Teacher exchange - Hilo, Hawaii, computer education and gifted and talented teacher/computer education coordinator.

7



*Stanley Gale*
*2205 Douglas Mt. Dr.*
*Golden, Colorado 80403*
*rockymsc@earthlink.net*

Rocky Mountain Ski Consulting

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

# Exhibit 2

11/13/14

## Four Years Previous Testimony

1. Susan Mullen v. Taos Ski Valley, Inc., Taos Ski Academy, Inc., and Taos Sports
   Associates, Inc.
   Deposition Testimony 3/11
   Voorhees Law Firm
   411 St. Michaels Place, Suite 1
   Santa Fe, New Mexico 87505
   Attorney Scott Voorhees
   In the United States District Court for the District of New Mexico
   Case No.: 6:10-CV-162

2. Kimberly N. Squires, by and through her Guardian and Natural Parent, Lyle K. Squires v.
   James Michael Goodwin, an individual, and Breckenridge Outdoor Education Center, a
   Colorado Corporation, and Mountain Man, Inc., a Montana Corporation
   Deposition Testimony 4/11
   The Gold Law Firm, LLC
   7375 East Orchard Road, Suite 300
   Greenwood Village, Colorado 80111
   Attorneys Gregory A. Gold and Coleen Parsley
   In the United States District Court for the District of Colorado
   Case No.: 10-CV-00309

3. James R. Margolis, M.D. v. Bernard Breen
   Deposition Testimony 4/11
   Chalat, Hatten, and Koupal P.C.
   1900 Grant Street, Suite 1050
   Denver, Colorado 80203
   Attorney James Chalat
   In the United States District Court for the District of Colorado
   Case No.: 10-cv-00220-WYD-KLM

4. Sarah Taylor v. The Stratton Corporation and Intrawest ULC
   Deposition Testimony 7/11

Page **1** of **8**



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

Trial Testimony 1/12
Law Office of Todd Schlossberg
74 Main Street
Burlington, VT  05402
Attorney Todd Schlossberg
United States for the District Court for the District of Vermont
Civil Case No.: 2:09-cv-297

5.  The Estate of Chance Aaron Nash, deceased, by his personal representative, Diane
    Nash vs. Duncan Park Commission
    Deposition Testimony 8/11
    Law Office of John Tallman
    4020 East Beltline Ave.
    Grand Rapids, Michigan 40525
    Attorney John Tallman
    State of Michigan, In the Circuit Court for the County of Ottawa
    Case No: C.A. 10-02119-NO

6.  Jill Sintek and Charles Sintek v. Keith Gill
    Deposition Testimony 10/11
    Law Firm of Saul Sarney
    4346 South Ulster Str., #980
    Denver, Colorado 80237
    Attorney Saul Sarney
    Hauptman, O'Brien, Wolf, and Lathrop P.C.
    1005 South 107th Ave., Suite 200
    Omaha, Nebraska 68114
    Attorney Tim O'Brien
    District Court, County of Boulder, Colorado
    Case No.: 09CV1319

7.  Max Kane vs. Patrick C. Nealon
    Deposition Testimony- 10/11
    Law Office of Todd Schlossberg
    4 Main Street
    Burlington, VT  05402
    Attorney Todd Schlossberg



*Stanley Gale*
*2205 Douglas Mt. Dr.*
*Golden, Colorado 80403*
*rockymsc@earthlink.net*

Rocky Mountain Ski Consulting

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

United States for the District Court for the District of Vermont
Civil Docket: 2-10-CV-27

8. Carol Oakley v. Nova Guides, Inc., a Colorado Corporation
   Deposition Testimony, 1/12
   Stevens, Littman, Biddison, Thorp, and Weinberg
   250 Arapahoe Str., Suite 301
   Boulder, Colorado 80203
   Attorney Mark Biddison
   District Court, Eagle, Colorado
   Case No.: 10CV980

9. Sheree Perez vs. Clear Creek Skiing Corporation d/b/a Loveland Ski Area, Oz
   Parkworks, LLC and Chad Ozdemir
   Deposition Testimony, 2/12
   Bogue and Paoli
   1401 17th Str., Suite 320
   Denver, Colorado 80202
   Attorney Jeff Bogue
   District Court, County of Clear Creek, Colorado
   Case No.: 2011-CV-12

10. Alan J. Kegler and Carol Wannamacher v. State of New York, Olympic Regional
    Development Authority, and Whiteface Mountain Ski Resort
    Trial Testimony, 4/12
    Webster Szanyi
    1400 Liberty Building
    Buffalo, New York 14202
    Attorney Ted Graney
    State of New York: Court of Claims
    Claim No.: M 76355

11. Kathryn Torres and Osvaldo Escarte, Ashley Torres-Escarte, a minor child, by and
    through her parents Kathryn Torres and Osvaldo Escarte, and Estefano Escarte, a



*Stanley Gale*
*2205 Douglas Mt. Dr.*
*Golden, Colorado 80403*
*rockymsc@earthlink.net*

Rocky Mountain Ski Consulting

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

minor child, by and through his parents Kathryn Torres and Osvaldo Escarte vs.
Tonia Kushin, Jamie Stacks, and the Pribilof School District
Deposition Testimony, 5/12 and 8/12
Weidner and Associates
330 L Str., Suite 200
Anchorage Alaska 99501
Attorney Phillip Weidner
Law Office of David Weed
1227 West 9th Ave., Suite 300
Anchorage Alaska 99501
Attorney David Weed
In the Superior Court for the State of Alaska
Third Judicial District at Anchorage
Case No.: 3AN-10-4308 CI

12. Jody R. Williams and Andrea Williams vs. Old Faithful Snowmobile Tours, Inc. and Old
Faithful Tours, Inc., and Tony Mayer
Deposition Testimony 9/12
Attorney William Fix, Jackson, Wyoming
Brown Law Firm, West Chester Pennsylvania
Attorney Carolyn Hahn
United States District Court, District of Wyoming
Case No.: 11-CV-287-F

13. Jeffrey R. Johnson v. Hawksnest Ski and Snowtubing Inc., Hawksnest Utilities, Inc.,
Ski Hawksnest Inc., and Hanging Rock Golf Club, Inc.
Trial Testimony, 9/12
Wigger Law Firm, Charleston, South Carolina
Attorney Jerry Wigger
Caldwell Helder Helms and Robinson, P.A., Monroe North Carolina
Attorney, R. Kenneth Helms
State of North Carolina, County of Watauga
In the General Court of Justice, Superior Court Division
File No.: 11-CVS-22

14. Phillip Rutherford and Wendy Rutherford, on behalf of their minor child Levi
Rutherford, individuals vs. Talisker Canyons Finance Company, L.L.C., a Delaware



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

limited liability company, d/b/a The Canyons and Summit Ski Team, Inc.
Deposition Testimony, 10/12
Eisenberg and Gilchrist
Salt Lake City, Utah
Attorney David Cutt
Law Office of David Kottler
Salt Lake City, Utah
Attorney David Kottler
In the Third Judicial District Court-Silver Summit, Summit County, State of Utah
Case No.: 100500564

15. Elizabeth Davis v. Cameron Griffiths
Deposition Testimony 10/12
Law Office of Catherine Collard, Salt Lake City, UT
Attorney Catherine Collard
In the Third Judicial District Court in and for Salt Lake County, State of Utah
Civil No.: 110917238

16. Todd Rudy vs. Wilmot Mountain, Inc.
Deposition Testimony, 10/12
Levin, Riback Law Group PC, Chicago, Illinois
Attorneys Amy Wilson and Richard Levin
In the U.S. District Court for the Northern District of Illinois Eastern Division
Case No.: 10-cv-7219

17. Hee Won Kim v. Dustin Nirschl
Deposition Testimony, 3/13
Trial Testimony, 4/13
Laszlo and Associates, Boulder, Colorado
Attorneys Theodore Laszlo and Michael Laszlo
District Court, Boulder County
Case No.: 2011-CV-1896

18. Ewald Paulus and Barbara Paulus Individually and as husband and wife vs. Holimont, Inc.
Deposition Testimony, 8/13
Andrews, Bernstein, Moranto, and Nicotra PLLC, Buffalo, New York
Attorney Richard Nicotra, 4/13
United States District Court for the Western District of New York
Case No.: 12-CV-0055



*Stanley Gale*
*2205 Douglas Mt. Dr.*
*Golden, Colorado 80403*
*rockymsc@earthlink.net*

**Rocky Mountain Ski Consulting**

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

19. Joseph Ryan, an individual vs. Solitude Ski Corporation, a Delaware Corporation, d/b/a
    Solitude Ski Resort Company, d/b/a Solitude Mountain Resort
    Deposition Testimony 10/13
    Eisenberg, Gilchrist, and Cutt, Salt Lake City, Utah
    Attorneys David Cutt and David Kottler
    Third District Court, Salt Lake City, State of Utah
    Case No.: 1200907173

20. David Moll, an Individual vs. Ian Cochran a minor, and Lisa Roberts and "John Does"
    Roberts and the Marital Community Composed thereof
    Deposition Testimony, 10/13
    Durham Law Offices, Bellevue, Washington,
    Attorneys David Soles and Ann Durham
    Superior Court of Washington for King County
    Case No.: 12-09881-6 SEA

21. George Dobbs and Karen Dobbs v. Seth Reuter
    Deposition Testimony, 11/13
    Chalat Hatten Koupal Banker, P.C., Denver, Colorado
    Attorneys James Chalat and Russell Hatten
    District Court Summit County, Colorado
    Case No.: 2012-cv-240

22. Brett Chamberlain, an Individual vs. David Hedderly-Smith, an Individual
    Deposition Testimony, 11/13
    Eisenberg, Gilchrist, & Cutt, Salt Lake City, UT
    Attorney David Cutt
    In the Third Judicial Court
    Summit County, State of Utah
    Case No.: 1205000092

23. Alden Daniel Sheffield , Jr. and Pamela R. Sheffield vs. Caleb Greenam, a minor, by and
    through his parents, Carlo Trevino and Karina Trevino
    Deposition Testimony- 3/14
    The Law Offices of David A. Helmer, LLC, Frisco, Colorado
    District Court, Eagle County, State of Colorado
    Case No.: 12CV1033

24. Pei Zhang v. Smugglers' Notch Management Company Ltd., dba Smuggler's Notch



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

*Off :* (303) 279-0454
*Fax :* (303) 279-0453
*Cell:* (303) 902-4423

Resort
Deposition Testimony 5/14
Law Office of Todd Schlossberg, Burlington, Vermont
Attorney Todd Schlossberg
In the United States District Court of the District of Vermont
Civil Case No.: 2:11-CV-302

25. Lionel Harris v. Gregory Lynn Hoekstra
Deposition Testimony 5/14
Carlson and Carlson, Dillon, Colorado
Attorney ??
In the United States District Court for the District of Colorado
Case No.: 120cv-02658-REB-CBS

26. Joseph Pfisterer vs. Christopher B. Nelson
Deposition Testimony 6/16
Law Office of David Kottler, Salt Lake City, Utah
Attorney David Kottler
Third District Court, Salt Lake Department, Salt Lake County, State of Utah
Case No.: 130903729

27. Jody R. Williams and Andrea Williams vs. Old Faithful Snowmobile Tours, Inc. and
Old Faithful Tours, Inc., and Tony Mayers
Court Testimony7/14
Vinci Law Firm, Denver, Colorado
Attorney Brian Schmidt
United States District Court, District of Wyoming
Case No.: 11-CV-287-F

28. Jennifer Taylor v. Boyne Mountain Resort, L.L.C. A Michigan Limited Liability Company
Deposition Testimony, 11/14
Buckfire and Buckfire, P.C., Southfield, Michigan
Attorney, Robert Lantzy,
State of Michigan, In the Circuit Court for the County of Charlevoix
File No.: 14-0736-24-NO



*Stanley Gale*
*2205 Douglas Mt. Dr.*
*Golden, Colorado 80403*
*rockymsc@earthlink.net*

*Rocky Mountain Ski Consulting*

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

Page **8** of **8**



*Stanley Gale*
*2205 Douglas Mt. Dr.*
*Golden, Colorado 80403*
*rockymsc@earthlink.net*

**Rocky Mountain Ski Consulting**

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

# **Exhibit 3**

1. <u>Court Documents</u>
   a.) Amended Complaint (With Jury Demand)
   b.) Defendant's Perfect North Slopes, Inc. Amended Answer
   c.) Plaintiff's Memorandum in Opposition to Motion for Summary Judgment of Defendant Perfect North Slopes, Inc.
   d.) Entry on Summary Judgment
   e.) Plaintiff's Discovery Responses
   f.) Defendant's Discovery Responses
   g.) Various PNS Subpoenas
   h.) Order Granting joint Motion to Modify the Scheduling Order
   i.) Defendant Perfect North Slopes, Inc. Answers to Plaintiff's First Set of Interrogatories and request for Production of Documents
   j.) Plaintiff's Answers to Defendant Perfect North Slopes, Inc., Second Interrogatories and Request for Production
   k.) Defendant Perfect North Slopes, Inc. Second Interrogatories and Requests for Production to Plaintiffs
   l.) Plaintiff's Answers to Defendant Perfect North Slopes, Inc.  Second Interrogatories and Request for Production
   m.) Attorney's redacted documents pages 1-8
   n.) Plaintiff's List of Perfect North Slopes Witnesses to Depose

2. <u>Depositions and exhibits:</u>
   a.) Alan Henning
   b.) Andrew Broaddus
   c.) Anthony Waar
   d.) Betty Heist
   e.) Cheryl Mantle
   f.) Chip Perfect
   g.) Christopher Daniel
   h.) Chuck Heist
   i.) Deborah Henderson
   j.) Heidi Lehman
   k.) James Sauter
   l.) Jason Canup
   m.) Jenny Waar
   n.) J█████ S█████
   o.) Kali Boecher
   p.) Katherine Hester
   q.) Keith Hartman

1



**Stanley Gale**
2205 Douglas Mt. Dr.
Golden, Colorado 80403
rockymsc@earthlink.net

Rocky Mountain Ski Consulting

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

      r.) Kelsi Carlson
      s.) Kenneth Gorret
      t.) M███ S███
      u.) Mike Mettler
      v.) Piper Sauter
      w.) Robert Urbanski
      x.) Sean Stott
      y.) Stephanie Daniel
      z.) Thomas Boecher
      aa.)Thomas Price

3. MountainGuard Claim Kit

4. <u>Ski Magazine</u>
      a.) "Amusement Parks on Snow," Paul Tolme, Spring, 2014.
      b.) "Slip and Slide," Lauren Parker, February 2009.

5. <u>Ski Area Management Magazine:</u>
      a.) "Signage in the Right Place," Ruth Nielsen, November, 2011.
      b.) "Reining in Risk," Ken Castle, January, 2011.
      c.) "In the Fast Lane," Peter Oliver, January 2011.
      d.) "Tubing needs Legal Attention, Jim Ruhl.

6. <u>Research, websites, and Gale custom and practice tubing files</u>
      a.) Midwest Ski Areas Association
      b.) Paoli Peaks Snowtubing
      c.) Perfect North Slopes
      d.) Tube Pro
      e.) Hawksnest Snowtubing
      f.) Gale Tubing Custom and Practice File Photographs
      g.) Snowtubing Responsibility Code, Ontario Canada
      h.) Ohio Snowtubing
      i.) Glen Eden, ON Tubing
      j.) Helmets avaialble signage photograph
      k.) LaneMaster
      l.) World Cup Supply Safety Products
      m.)Zaugg Tubing Lane Designer

7. Wil00001- 343 confidential documents.

2



*Stanley Gale*
*2205 Douglas Mt. Dr.*
*Golden, Colorado 80403*
*rockymsc@earthlink.net*

Rocky Mountain Ski Consulting

*Off : (303) 279-0454*
*Fax : (303) 279-0453*
*Cell: (303) 902-4423*

8. <u>National Ski Areas Association:</u>
   a.) Incident Investigation Resource Guide
   b.) Tubing Operations Resource Guide

9. PSN Tubing Incident Reports including PSN Incident Reports 2005-2006 Involving Collisions in Snow Tubing Area.

10. PSN Incident Reports Documents 00114-00126, 00128, including 6 pages of PNS black and white photographs.

11. Gale February 13,2014 PNS Investigation and Field Notes.

12. Dearborn County Ambulance Reports PNS Incident Response Listings.

3

INCIDENT DIAGRAM    Exhibit 4

RESORT _Perfect North Slopes_    INCIDENT DATE _1/30/2011_ TIME OF INCIDENT _16:30_    ☐AM ☐PM

INJURED'S NAME _M███ S███_    LOCATION _Tubing Park._

| APPROX ≅ | BAMBOO (B) | BULL WHEEL ⊕ | PHOTO LOCATION | CHAIR | CREEK | DIR. OF TRAVEL |
|---|---|---|---|---|---|---|
| HOLE | LIFT —X—X—X— | LIFT TOWER | SIGN | LIFT SHACK | MOGUL | MANMADE BARRIER |
| PERM. SIGN/POST ⊙ | POINT OF IMPACT ⊠ | POINT OF REST (R) | VEHICLE ⊠ | INJURED'S PATH →→→ | STUMP ◎ | EDGE OF MAINT. SURFACE |
| HYDRANT | TRAIL BOUNDARY (TREELINE) | HARDWOOD TREE | PINE TREE △ | FEMALE ♀ | MALE ♂ | WITNESS (W) |

LANE 9    LANE 8    LANE 7    LANE 6    LANE 5    LANE 4

Anthony
Jenny     Chris
Andrew    Stephanie

J
M

13'6" wide

13.6" wide Lanes

39°08.874N
084°53.499w

Cross over Point

39°08.91N
084°53.402w
Point of Impact /Rest

25 ft

← Run out Area →

From All witness statement Are belief is that the tubers from
Lane 7 crossed over to lane 8. This crossing slowed them to
A stop before reaching the Run out Distance that the other Tubes
were Achieving During that time Period.

SLOPE ANGLE: _____

NOT TO SCALE

INVESTIGATOR'S SIGNATURE _Mike Mettler      Tom Price_    DATE _1/30/2011_

PRINT NAME _Mike Mettler      Tom Price_

MG 11/06

00128











Exhibit 5- #1



Exhibit 5- #2



Exhibit 5- #3



Exhibit 5- #4